McGEE, Chief Judge.
Joseph K. Byrd, Jr. ("Plaintiff") appeals a decision of the North Carolina Industrial Commission denying his claim for workers' compensation. For the reasons discussed below, we affirm.
I. Factual and Procedural Background
Plaintiff began working as a plumbing specialist for Lowe's Home Centers, Inc. ("Defendant") in 2009. Plaintiff worked on the sales floor assisting customers and "lifting [ ] items such as toilets, water heaters, [and] showers [.]" Over the course of several years, Plaintiff received promotions to plumbing manager and hardware and tools manager. Although Plaintiff was assigned new administrative duties in these management positions, "[his] regular duties of lifting [merchandise], [and] assisting customers[,] ... [did not] change." Plaintiff also regularly used a pneumatic lift to "downstock" items, i.e. , retrieve merchandise stocked on shelves too high for customers to reach.
Plaintiff was working in Defendant's hardware and tools department with a co-worker, Greg Branch ("Branch"), on 16 May 2013. According to Plaintiff, "[s]omewhere during the course of the afternoon [Branch] came to [him] and indicated that [they] had to downstock two different items, ... a compound saw, and ... a [saw] stand." Branch used the lift to retrieve a compound saw from the left side of the aisle. Plaintiff then rolled the lift over to the right side of the aisle in order to retrieve a box containing the saw stand, which was stored on "the very top stock shelf, ... around [fifteen] feet [high] [.]" The box weighed approximately fifty-five pounds. Plaintiff attempted to slide the box off the shelf and onto the lift platform, but "the opening on the [ ] lift was not wide enough for the box ... [because the box was] laying down on its side." Plaintiff testified:
So what I was trying to do was to lift the box to a more sitting position, [a] standing up position ... so that I could then slide it onto the [lift] platform.... I had to lean over [a] rail to turn the box up on its bottom side.
So when I leaned over [ ] to pick it up, I reached under to pick the box up, with the rails under my armpit, and when I turned it up ... that's when I felt an extreme, sharp pain with a pop in my lower back. Actually-well, it was [my] extreme lower back, right above my pelvis area.
Plaintiff slid the box onto the lift and lowered the lift to floor level. Plaintiff told Branch he could not unload the box from the lift.
Branch stated that while Plaintiff was using the lift to retrieve the saw stand, Branch was standing below "watching the aisles[ ]" and not looking at Plaintiff. Branch testified that, pursuant to store safety guidelines, "usually the employees left down [in the aisle] don't really pay attention to the employee [using] the lift[;] [they] watch the aisles for customers coming in [who are] not paying attention." While Plaintiff was using the lift, Branch said he
heard a noise ... like a snap, pop, thud, [or] something. And then I heard [Plaintiff] kind of ... give out a noise in pain[.] ... And at that time I looked up and observed [Plaintiff] holding his back[.] ... And [it] just seemed that [Plaintiff] was in pain.
According to Branch, when Plaintiff lowered the lift to ground level and stepped off, "he was struggling pretty good[.]" Branch also worked with Plaintiff the following day, and observed that Plaintiff "was [moving] pretty slow, [and] couldn't ... move around real good." Plaintiff told Branch he was "in pretty bad shape ... [and that] he hurt."
Plaintiff testified that, shortly after he got off the lift on 16 May 2013, he "tried to call [the] [h]uman [r]esources [department]" several times to report his injury, but was unable to reach the human resources officer and did not leave a message. Plaintiff worked until his shift ended around 5:00 p.m., but testified he was not able to perform his usual job duties that afternoon and Branch "took care of most everything." Plaintiff said he tried to find the human resources officer before he left work, but "her [office] door was locked ... [and] she was not there in the office."
Plaintiff testified he called an assistant store manager the following morning, 17 May 2013, and indicated he "had hurt [his] back [the day before] and that [he] had to go to the [u]rgent [c]are to get some help[.]" This was the first time Plaintiff spoke with a supervisor about the 16 May 2013 incident. Plaintiff was examined by an urgent care provider and received several steroidal "trigger point" shots in his back. He then reported to work. That afternoon, Plaintiff spoke with a human resources officer and gave a written statement describing the lift incident.
Plaintiff was referred to Defendant's regular workers' compensation medical care provider, Burke Occupational Care, where he was examined by physician assistant William Vaassen ("P.A. Vaassen") on 20 May 2013. Based on Plaintiff's description of the recent injury and Plaintiff's medical history, P.A. Vaassen assessed Plaintiff as having "[a]cute back pain ... with chronic back pain." He prescribed a ten-day course of prednisone for Plaintiff, and recommended stretching exercises. P.A. Vaassen held Plaintiff off work pending a reexamination the following week. When Plaintiff returned to see P.A. Vaassen on 27 May 2013, Plaintiff reported his back pain was "more intense" and "getting worse." P.A. Vaassen noted Plaintiff "appear[ed] pathetic, walking bent over at the waist[,] taking minutes to stand after sitting[,] and moaning frequently." P.A. Vaassen prescribed Plaintiff a different pain medication and encouraged Plaintiff "to be more active."
Plaintiff returned to P.A. Vaassen on 11 June 2013 and reported "he [was] absolutely no better at all." Plaintiff had left a note for P.A. Vaassen the night before "basically saying that he [was] barely able to function ... and [was] getting much worse." P.A. Vaassen made a notation in Plaintiff's medical chart, however, that "an observer who [knew Plaintiff was] out [with a] worker's comp[ensation] injury[ ] took a [photograph] of [Plaintiff] ... [that] evening, riding a lawn mower in no apparent distress ... [and] sitting upright." At the 11 June 2013 visit, P.A. Vaassen stated Plaintiff was "not consistent with the severity of [his] complaints[,]" declined to refill Plaintiff's prescription pain medication, and again recommended stretching to Plaintiff. P.A. Vaassen indicated that, pending the results of an MRI, Plaintiff would receive a referral to either a pain clinic or a back specialist.
Plaintiff had an MRI of his spine on 14 June 2013 ("the 2013 MRI") and, according to medical experts who subsequently reviewed the results, Plaintiff had grade II spondylolisthesis at the L5 to S1 vertebrae. Plaintiff returned to P.A. Vaassen on 19 June 2013 to obtain the 2013 MRI report, and P.A. Vaassen observed Plaintiff leave the office and "bend[ ] to get in a [low sports car] [without any] apparent problem."
Plaintiff was released to return to work with certain work restrictions and returned to work on 18 July 2013. Defendant attempted to accommodate Plaintiff's work restrictions by reassigning Plaintiff from the hardware department to the self-checkout aisles. Defendant instructed Plaintiff not to do any lifting, bending, or straining, and provided him with a stool "so [he] could sit down when it became too hard to stand up." Plaintiff testified these accommodations worked "fairly well" when he first returned to work, but that over time it "became more and more painful to stand up" and "harder ... to sit [ ] and then stand up, and then hold onto [shopping carts] and things like that to talk with [customers]."
Defendant filed a Form 28T on 18 July 2013 notifying Plaintiff it was terminating Plaintiff's disability compensation because of his return to work. Defendant filed a Form 61 on 24 July 2013 denying Plaintiff's claim for workers' compensation. Defendant stated it had "received medical information that [Plaintiff was being] treat[ed] for chronic low back pain for over a year before the date of [Plaintiff's] alleged injury [on 16 May 2013]" and concluded "[Plaintiff's] current complaints of pain [were] not directly related to the [16 May 2013 incident][.]" Plaintiff submitted a Form 33 on or about 6 May 2015 requesting that his claim for compensation be assigned for hearing. A hearing was held on 27 January 2016 before deputy commissioner James C. Gillen ("Deputy Commissioner Gillen").
Plaintiff, who was sixty-six years old at the time of the hearing, had a documented history of chronic back pain. He sustained a wrestling injury to his back at age fifteen and re-injured his back in 2010 in a work-related incident. Plaintiff was treated for back pain by Dr. Scott McCloskey ("Dr. McCloskey"), a neurosurgeon, after his 2010 back injury. Prior to seeing Dr. McCloskey in 2010, Plaintiff was being treated for back pain by his family physician, who prescribed a narcotic pain medication for Plaintiff that he was still using at the time of his alleged 16 May 2013 work incident. Dr. McCloskey testified Plaintiff "[had] a pretty significant deformity of his low back, his lumbar spine, back in 2010." A 2010 MRI ("the 2010 MRI") of Plaintiff's spine showed Plaintiff had second-degree spondylolisthesis at the L5 to S1 vertebrae, a degenerative condition, causing "[s]evere low back pain." Plaintiff testified Dr. McCloskey "recommended a surgery" to Plaintiff in 2010, which Plaintiff "elected not to have[.]"[1] Dr. McCloskey last saw Plaintiff in connection with the 2010 injury on 28 July 2010.
Plaintiff saw Dr. McCloskey for a new neurological consultation on or about 5 June 2013. Based on Plaintiff's physical presentation and description of his pain level, Dr. McCloskey formed the opinion that Plaintiff's back condition had worsened as a result of Plaintiff's alleged recent injury. Dr. McCloskey ordered a new MRI and x-rays "to evaluate [Plaintiff's] new injury" in light of Plaintiff's "pre[-]existing [back] problem." Dr. McCloskey testified during a deposition that the 2013 MRI did not appear to show any change in Plaintiff's back condition since the 2010 MRI, and stated that Plaintiff's condition "was a pretty bad problem even in the past." Dr. McCloskey agreed that "other than [P]laintiff's ... subjective complaints [ ] there was [no] change in his condition[.]" Dr. McCloskey made the following note in Plaintiff's medical chart after seeing Plaintiff on 31 July 2013:
I told [Plaintiff] that I would recommend that he try to avoid surgery if possible, for it would be a major instrumented fusion at a couple levels.... If [Plaintiff] could maintain the status quo without an operation, this would be the best choice. Still, [Plaintiff] has been hurt from the injury of 2010 [involving] a water heater and then more recently in May of this year.... We will see [Plaintiff] back as needed. [His family physician] is [providing] his pain medicine.
Dr. McCloskey also referred Plaintiff to other specialists, including Dr. Christopher Brown ("Dr. Brown"), an orthopedic neurosurgeon at Duke University Medical Center, whom Plaintiff consulted on 29 October 2013. Plaintiff complained of "back pain and radiating leg pain ... [that] was activity related" and told Dr. Brown that "conservative" treatment "[such as] injections and [ ] physical therapy was not controlling [his] pain." Dr. Brown testified that Plaintiff did not mention "that his back problems were the result of a work related incident[.]" Dr. Brown did not recall reviewing Plaintiff's medical records regarding Plaintiff's pre-existing back condition or prior treatment. Plaintiff did provide Dr. Brown with the results of the 2013 MRI. Dr. Brown testified that "on the [2013] MRI [Plaintiff's condition] was still a [g]rade II spondylolisthesis." Dr. Brown ultimately told Plaintiff
that the decision for surgery in [Plaintiff's] situation [was] strictly a quality of life decision. Whether [Plaintiff decided to] proceed[ ] with surgery or continue[ ] to do conservative treatment [was] strictly up to him. [Plaintiff's condition] isn't something that paralyzes you or takes away your ability to walk. It causes pain and suffering, so the decision [whether to have surgery] was up to him.
Plaintiff underwent fusion surgery on 31 January 2014. At the 27 January 2016 hearing, Plaintiff testified that, due to ongoing back pain, he
[could not] do any work according to what normal[ ] expectations are for [a] construction worker or any other kind of work. I'm not able to do full, eight-hour days. I can't do any of the labor-type work. I can't find a job that will hire me just to sit around, walk rounds, [and] tell people [what to do][.]
Plaintiff also testified he was still taking strong prescription pain medication and had increased his daily intake since the January 2014 surgery.
Deputy Commissioner Gillen filed an opinion and award on 29 July 2016 finding Plaintiff "ha[d] not proven that any alleged 16 May 2013 [workplace] incident directly or indirectly caused [his] current back condition or caused an aggravation or exacerbation of [P]laintiff's pre-existing chronic back condition." That opinion concluded Plaintiff "failed to meet his burden of proving by a preponderance of the evidence in view of the entire record that he sustained a compensable specific traumatic incident of the work assigned on 16 May 2013."
Plaintiff appealed the decision to the Full Commission ("the Commission"). The Commission filed an opinion and award on or about 17 April 2017 finding that "[g]iven the conflicting and inconsistent evidence regarding Plaintiff's symptoms, taken with the equivocal medical evidence and Plaintiff's significant pre-existing chronic back condition," Plaintiff failed to prove he sustained a compensable injury on or about 16 May 2013 or that any incident alleged to have occurred on that date "caused Plaintiff's current back condition or caused an aggravation or exacerbation of [his] pre-existing chronic back condition." The Commission concluded Plaintiff's claim was not compensable under the North Carolina Workers' Compensation Act. Plaintiff appeals.
II. Plaintiff's Appeal
Plaintiff argues the Commission erroneously concluded Plaintiff failed to prove (1) that he "sustained a compensable specific traumatic incident of the work assigned on 16 May 2013" or (2) that any work-related incident on 16 May 2013 caused Plaintiff's current back condition or materially exacerbated his pre-existing back condition. We disagree.
A. Standard of Review
In an appeal from an opinion and award of the Commission, "[t]his Court's review is limited to a consideration of whether there was any competent evidence to support the Commission's findings of fact and whether these findings of fact support the Commission's conclusions of law." Adams v. Kelly Springfield Tire Co. , 123 N.C. App. 681, 682, 474 S.E.2d 793, 794 (1996) (citation omitted) (emphasis in original). The Commission's findings of fact "are conclusive on appeal when supported by competent evidence, even though there [may] be evidence that would support findings to the contrary." Clawson v. Phil Cline Trucking, Inc. , 168 N.C. App. 108, 113, 606 S.E.2d 715, 718 (2005) (citation and quotation marks omitted); see also Johnson v. Herbie's Place , 157 N.C. App. 168, 171, 579 S.E.2d 110, 113 (2003) (noting Commission's findings of fact "may be set aside on appeal [only] when there is a complete lack of competent evidence to support them[.]" (citation and quotation marks omitted) (alterations in original) ). "Competent evidence is evidence that a reasonable mind might accept as adequate to support the finding [s]." Lewis v. CravenReg'l Med. Ctr. , 134 N.C. App. 438, 444, 518 S.E.2d 1, 5 (1999) (citation and internal quotation marks omitted) (alteration in original). The Commission's conclusions of law are reviewable de novo . See Coffey v. Weyerhaeuser Co. , 218 N.C. App. 297, 300, 720 S.E.2d 879, 881 (2012). "Under a de novo review, [this C]ourt considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." Fields v. H&E Equip. Servs., LLC , 240 N.C. App. 483, 486, 771 S.E.2d 791, 793-94 (2015) (citation and quotation marks omitted).
B. Analysis
1. Findings of Fact
Although Plaintiff states in his brief that he "assigns error" to numerous findings of fact in the Commission's opinion, he does not specifically argue that those findings were not supported by competent evidence. See N.C. R. App. P. 28(b)(6) (providing in part that "[i]ssues ... in support of which no reason or argument is stated[ ] will be taken as abandoned."). Plaintiff instead appears to challenge the Commission's interpretation of the evidence.[2] Plaintiff argues the Commission (1) "completely fail[ed] to acknowledge the testimony of the only non-party eyewitness, Greg Branch [,]" and (2) "misconstrued the expert medical evidence ... by not considering the [expert] testimony in its entirety and by misunderstanding the subtle point made by the expert physicians concerning [the 2010 and 2013] MRIs[.]" Plaintiff also contends the Commission failed to give him "the benefit of every reasonable inference to be drawn from the evidence[.]"
Plaintiff first argues the Commission "completely disregard[ed]" Branch's testimony that, while Plaintiff was using the lift to retrieve merchandise on 16 May 2013, Branch was standing in the aisle below and "heard a noise ... like a snap, pop, thud, [or] something." Branch testified he heard Plaintiff "give out a noise in pain" and then observed Plaintiff "holding his back[.]" Branch further stated that, after stepping off the lift, Plaintiff "was struggling pretty good" and "seemed ... [to be] in pain." According to Plaintiff, Branch's testimony that Plaintiff sustained a work-related injury in the course of his job duties on 16 May 2013 was "uncontroverted and it was clearly error [for the Commission] to completely disregard this competent evidence."
While "the Commission is the sole judge of the credibility of the witnesses and the weight to be given to their testimony, and may reject a witness'[s] testimony entirely if warranted by disbelief of that witness [,]" Plaintiff notes it "must consider and evaluate all of the evidence. Although the Commission may choose not to believe the evidence after considering it, it may not wholly disregard or ignore competent evidence." See Lineback v. Wake County Board of Commissioners , 126 N.C. App. 678, 680, 486 S.E.2d 252, 254 (1997) (citations omitted). In Lineback , this Court held the Commission improperly disregarded medical expert testimony about the cause of the plaintiff's injury. The Lineback plaintiff had made what appeared to be inconsistent prior statements about the exact cause of his injury, and certain expert testimony corroborated statements made by the plaintiff in an initial injury report. This Court concluded the Commission erred by "ma[king] no definitive findings to indicate that it considered or weighed [the medical expert's] testimony with respect to causation." Id. at 681, 486 S.E.2d at 254.
We find Lineback distinguishable from the present case. In this case, Branch did not testify as an expert medical witness or render an opinion about the precise cause of Plaintiff's injury. Compare with Whitfield v. Laboratory Corp. of Am. , 158 N.C. App. 341, 348, 581 S.E.2d 778, 784 (2003) ( "It is reversible error for the Commission to fail to consider the testimony or records of a treating physician ." (citation omitted) (emphasis added) ). Moreover, Branch acknowledged he did not directly observe the alleged injury occur. He testified he was standing in the aisle below as Plaintiff used the lift, and that "usually the employees left down [in the aisle] don't really pay attention to the employee on the lift[;] [they] watch the aisles for customers coming in [who are] not paying attention." Branch stated: "So [at the time of Plaintiff's alleged injury] I was watching the aisles and I heard a noise." Branch's remaining testimony concerned his observations of and conversations with Plaintiff immediately after the incident and the following day. However, Branch testified that he terminated his employment at Lowe's shortly thereafter and had no further in-person interaction with Plaintiff.[3]
The evidence thus showed that Branch, who was not a medical expert or treating physician, did not witness Plaintiff's alleged injury firsthand and had little contact with Plaintiff after the 16 May 2013 incident. The Commission was free to assign less weight to Branch's testimony in determining whether Plaintiff in fact suffered a work-related injury as alleged. See Hassell v. Onslow Cty. Bd. of Educ. , 362 N.C. 299, 307, 661 S.E.2d 709, 715 (2008) (noting "Commission is not required to accept the testimony of a witness, even if the testimony is uncontradicted ." (citation omitted) (emphasis added) ). The Commission's finding of fact number six, which Plaintiff has not challenged, suggests the Commission did consider Plaintiff's account of the events that occurred on 16 May 2013. Further, the Commission stated in its opinion that it had "reviewed the prior [o]pinion and [a]ward based upon the ... proceedings before the Deputy Commissioner, the Form 44 assignments of error[,] and the briefs and oral arguments of the parties before the Full Commission[.]" Based on the record before us, we cannot say the Commission "completely disregard[ed]" Branch's testimony. The Commission was entitled to consider the testimony "but decide[ ] to afford it little weight[.]" See Hassell , 362 N.C. at 307, 661 S.E.2d at 715.
Plaintiff also contends the Commission "misconstrue[ed] [ ] the entirety of Dr. McCloskey's testimony" by selectively emphasizing certain portions of the testimony in order to support a finding that Plaintiff's "clinical presentation was the same between 2013 (following the accident [alleged] in this case) and 2010 ( [when Plaintiff's] earlier back injury [occurred] )." The Commission stated in finding of fact fourteen:
Dr. Scott M. McCloskey was deposed subsequent to the hearing in this matter. Dr. McCloskey treated Plaintiff for back pain in 2010 and again in 2013. Dr. McCloskey testified that Plaintiff had "a pretty significant deformity of his low back, his lumbar spine, back in 2010." Although Dr. McCloskey testified that Plaintiff's 16 May 2013 workplace incident aggravated his pre-existing back condition, Dr. McCloskey also later testified that Plaintiff's presentations of pain in 2010 and 2013 were very similar, that a comparison of the 2010 and 2013 MRIs did not show any acute injury taking place between them, and that Plaintiff had second degree spondylolisthesis in 2010 and 2013. While he was treating Plaintiff in June 2013, Dr. McCloskey was not aware that Plaintiff was taking a significant amount of opioid pain medication prior to 16 May 2013. Dr. McCloskey also testified that, other than Plaintiff's subjective complaints, there was no evidence of a change in Plaintiff's condition between 2010 and 2013. Regarding a comparison of Plaintiff's 2010 and 2013 MRIs, Dr. McCloskey specifically testified: "Unless I'm missing something, it doesn't look like I had the two MRIs side by side and felt as if there was a change, so I'm assuming that there wasn't a change. It was a pretty bad problem even in the past."
According to Plaintiff, this finding improperly omitted other testimony by Dr. McCloskey indicating that, in his opinion, Plaintiff sustained "a new back injury [in 2013] on the background of [Plaintiff's] pre[-]existing [back] problem." Plaintiff notes that when Dr. McCloskey was asked whether he "believe [d] the [work-related] incident [Plaintiff] described to [him] ... significantly contributed to the symptoms that caused [Plaintiff] to be disabled in 2013[,]" he responded: "Yes." Dr. McCloskey also testified that "you don't necessarily have to see any change on an MRI or [x]-rays ... [because a new injury] may be on a fairly miniscule level anatomically and [ ] not necessarily show on an [x]-ray as something different."
When the Commission's "findings on [ ] critical issues ... are supported by some competent evidence in the record, this Court is bound by those findings [,]" even if there is conflicting evidence. See Bryant v. Weyerhaeuser Co. , 130 N.C. App. 135, 139, 502 S.E.2d 58, 62 (1998). "In making its findings, the Commission's function is to weigh and evaluate the entire evidence and determine ... where the truth lies. The [ ] Commission is the sole judge of the witnesses' credibility and may choose to believe all, a part, or none of any witnesses' testimony." Lumpkins v. Fieldcrest Mills , 56 N.C. App. 653, 660, 289 S.E.2d 848, 852-53 (1982) (citations, quotation marks, and internal quotation marks omitted) (emphases in original). As discussed above, the Commission "may not discount or disregard any evidence, but [it] may choose not to believe the evidence after considering it." Weaver v. American National Can Corp. , 123 N.C. App. 507, 510, 473 S.E.2d 10, 12 (1996) (citation omitted) (emphasis in original). This Court must be able to "reasonably infer that the Commission gave proper consideration to [witness] testimony." See Jenkins v. Easco Aluminum Corp. , 142 N.C. App. 71, 78, 541 S.E.2d 510, 515 (2001).
In Bryant , an employer challenged the Commission's finding that the plaintiff was depressed, on the basis that the Commission failed to take into account certain expert medical testimony that supported the employer's position that the plaintiff was not depressed. This Court acknowledged "that the evidence [did] reveal some [expert] testimony ... that would support a finding that [the p]laintiff was not depressed[,]" and that the Commission "did not specifically find that it was rejecting the evidence that would support a finding that [the p]laintiff was not depressed." Bryant , 130 N.C. App. at 139, 502 S.E.2d at 62. This Court concluded, however, that the Commission was not required to "make exhaustive findings as to each statement made by any given witness or make findings rejecting specific evidence that may be contrary to the evidence accepted by the [ ] Commission." Id.
In the present case, as in Bryant , the Commission's findings clearly demonstrate it gave proper consideration to Dr. McCloskey's testimony. See Pittman v. International Paper Co. , 132 N.C. App. 151, 156-57, 510 S.E.2d 705, 709 (1999). The Commission explicitly acknowledged Dr. McCloskey's testimony that Plaintiff's alleged 2013 workplace incident "aggravated his pre-existing back condition," but ultimately gave greater weight to other testimony by Dr. McCloskey indicating there was no medically apparent change in Plaintiff's back condition between 2010 and 2013.
Plaintiff raises similar challenges to the Commission's findings concerning the testimony of Dr. Brown and P.A. Vaassen. In finding of fact thirteen, the Commission noted that Dr. Brown testified he "[couldn't] give an opinion as to whether the [2013] trauma in [Plaintiff's] case led to him having surgery. I mean I can't give an opinion because I don't have any records of that. [Plaintiff] did not complain of that to me." According to Plaintiff, the Commission failed to note Dr. Brown's "expert opinion [that] 'new traumatic incidents' can trigger more disabling pain to a pre-existing back injury even where the [MRI] imaging ... may be similar before and after the new incident." At his deposition, Dr. Brown was asked whether, "[i]n [his] experience ... [a patient's pre-existing] back pain can become more acute and more disabling as a result of a new traumatic incident they have with the back[.]" He responded: "I believe that, yes." However, as reflected in the Commission's findings, Dr. Brown testified he could not provide an opinion on the question of causation in Plaintiff's case specifically. The Commission was not required to accept Dr. Brown's testimony that, hypothetically , a "new traumatic event" can aggravate a patient's existing medical condition. See , e.g. , Young v. Hickory Bus. Furn. , 353 N.C. 227, 230, 538 S.E.2d 912, 915 (2000) (noting that "when [ ] expert opinion testimony is based merely upon speculation and conjecture, ... it is not sufficiently reliable to qualify as competent evidence on issues of medical causation."). Additionally, as noted above, the Commission acknowledged elsewhere in its findings other expert testimony indicating that "Plaintiff's 16 May 2013 workplace incident aggravated his pre-existing back condition[.]"
Plaintiff also challenges the Commission's characterization of P.A. Vaassen's testimony in finding of fact fifteen. The Commission found, inter alia : "P.A. Vaassen testified that he stopped treating Plaintiff because of Plaintiff's misrepresentations regarding his pain, specifically explaining[,] 'I thought [Plaintiff] was untruthful and vastly exaggerating his symptoms.' " According to Plaintiff, the Commission "erroneously found that [P.A.] Vaassen ended [ ] Plaintiff's medical treatment due to ... Plaintiff's alleged exaggerated complaints. ... [P.A. Vaassen] simply referred [ ] Plaintiff to a back specialist due to [Plaintiff's] continued complaints." Plaintiff does not dispute that P.A. Vaassen expressed the opinions quoted in finding of fact fifteen. Plaintiff instead submits that "[P.A. Vaassen's] evidence is belied by his actual medical decision[.]" Again, Plaintiff merely disagrees with a determination of the Commission regarding the weight of the evidence, not the evidence itself.
As long as the Commission's findings are supported by competent evidence, "the [ ] Commission may choose to find facts in contradiction to the evidence presented by [the] plaintiff. The [ ] Commission has the responsibility to weigh the evidence presented and determine the credibility of witness testimony." Hummel v. University of N.C. , 156 N.C. App. 108, 117, 576 S.E.2d 124, 130 (2003). In the present case, Plaintiff has objected only to the weight afforded certain evidence and has not identified any findings of fact unsupported by competent evidence.
Although Plaintiff also asserts the Commission "failed to credit [him] with the benefit of every reasonable inference to be drawn from the evidence[,]" he offers no substantive argument beyond the general statement that the Commission "failed to even allude to the reasonable inferences to be drawn from the eye-witness testimony and from a reading of the entirety of the medical expert evidence." We do not find merit in this argument.
2. Conclusions of Law
a. Specific Traumatic Incident
The Commission noted in conclusion of law number three that "[u]nder the ... theory argued by Plaintiff in this case, Plaintiff ... [was required to] prove that the [alleged] injury was caused by a specific traumatic incident of the work assigned." See N.C. Gen. Stat. § 97-2(6) (2017). It then concluded Plaintiff "failed to meet his burden of proving by a preponderance of the evidence in view of the entire record that he sustained a compensable specific traumatic incident of the work assigned on 16 May 2013." Plaintiff designated conclusion of law number three among his proposed issues on appeal, and states summarily in his brief that the Commission "committed error as a matter of law and fact in concluding that [ ] Plaintiff did not prove he suffered a specific traumatic incident at work on or about 16 May 2013." However, Plaintiff's brief presents no real argument that the Commission's findings were insufficient to support conclusion of law number three, other than his contention that the Commission erred by "disregarding" Branch's "uncontroverted" testimony "that [ ] Plaintiff suffered an injury due to a specific traumatic incident while in the course of his job duties on 16 May 2013[.]" As discussed above, the Commission was entitled to determine the credibility and weight of Branch's testimony, and was "not required to make specific findings on [witness] credibility[.]" See Rogers v. Smoky Mountain Petroleum Co. , 172 N.C. App. 521, 529, 617 S.E.2d 292, 298 (2005). Plaintiff offers no additional argument with respect to conclusion of law number three. We find no merit in any contention by Plaintiff that the Commission's findings did not support a conclusion that Plaintiff failed to prove an injury caused by a specific traumatic incident.
This Court has held that the definition of "specific traumatic incident" is not limited to "an instantaneous occurrence. Back injuries that occur gradually, over long periods of time, are not specific traumatic incidents; however, ... events which occur contemporaneously, during a cognizable time period, and which cause a back injury, do fit the definition intended by the [L]egislature." See Richards v. Town of Valdese , 92 N.C. App. 222, 225, 374 S.E.2d 116, 119 (1988). "In determining whether an injury occurred at a cognizable time, it is not necessary to allege the specific hour or day of the injury[;]" however, "the [ ] Commission [must be able] to determine when, within a reasonable period, the specific injury occurred. The evidence must show that there was some event that caused the injury, not a gradual deterioration." Ruffin v. Compass Grp. USA , 150 N.C. App. 480, 483-84, 563 S.E.2d 633, 636 (2002) (citations and internal quotation marks omitted).
In the present case, the unchallenged findings of fact showed that, inter alia , (1) Plaintiff "had a significant history of back problems prior to 16 May 2013[,]" including a decades-old high school wrestling injury and a 2010 work-related injury; (2) prior to the alleged 16 May 2013 incident, Plaintiff "was taking a significant amount of opioid medication on a daily basis for his chronic back condition[;]" (3) a 2010 MRI of Plaintiff's lumbar spine showed Plaintiff suffered from degenerative, grade II spondylolisthesis, the same condition doctors observed on an MRI conducted after the alleged 2013 workplace incident; (4) Plaintiff considered having back surgery in 2010; and (5) Plaintiff reported to a neurosurgeon in 2010 that he had experienced low back pain "for years and years" and that the 2010 work-related injury "aggravated his symptoms." Further, Plaintiff's credibility as a witness-which was for the Commission to determine-was key, because the only direct evidence of the alleged specific traumatic event was Plaintiff's own account. In finding of fact number seven, which Plaintiff also has not challenged, the Commission found that P.A. Vaassen expressed concerns in late May 2013 that Plaintiff was exaggerating his symptoms and "not [being] consistent with the severity of [his] complaints." This argument is overruled.
b. Causation
Plaintiff argues the Commission erroneously concluded in conclusion of law number five that
Plaintiff [ ] produced insufficient evidence to prove that his current back problems are a direct and natural result of any incident that may have taken place on or about 16 May 2013, or that any incident that may have taken place on or about 16 May 2013 materially exacerbated or aggravated his significant pre-existing chronic back condition.
According to Plaintiff, Dr. McCloskey's testimony established the requisite element of causation "between the 16 May 2013 incident at work and [ ] Plaintiff's resulting disability." We disagree.
"[W]here the exact nature and probable genesis of a particular type of injury involves complicated medical questions far removed from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the injury." Rogers , 172 N.C. App. at 528, 617 S.E.2d at 297 (citation and quotation marks omitted). "[T]he 'mere possibility of causation,' as opposed to the 'probability' of causation, is insufficient to support a finding of compensability." Whitfield , 158 N.C. App. at 351, 581 S.E.2d at 785 (citation omitted). In the present case, as reflected in the Commission's findings, the expert medical testimony supported, at best, a "mere possibility of causation."
Dr. McCloskey did not examine Plaintiff until several weeks after the alleged workplace incident. Dr. McCloskey testified he had no contact with Plaintiff from 28 July 2010 until Plaintiff's 5 June 2013 visit, when Plaintiff told Dr. McCloskey he was experiencing increased back pain as a result of a recent work-related injury. Dr. McCloskey repeatedly acknowledged that his opinion regarding the aggravation of Plaintiff's pre-existing back condition was "based on [Plaintiff's] subjective statements ... [regarding] his pain level [.]" Counsel for Defendant asked Dr. McCloskey: "So you cannot say that there's any other evidence other than [P]laintiff's ... subjective complaints that there was a change in his condition, is that correct?" Dr. McCloskey responded: "That's correct." Dr. McCloskey agreed unequivocally that Plaintiff "[did not] have any change to [his] underlying orthopedic problem" between 2010 and 2013. Dr. McCloskey also testified that, when he saw Plaintiff in June 2013,
[Plaintiff] seemed to have that degree of pain [as] when I saw him in 2010. But then [Plaintiff] said that over the course of the subsequent three years, [the pain] was okay and manageable. And then [Plaintiff said ] the pain appropriately worsened with that [16 May 2013] experience at work. So, I mean, that's just the history that I have to go on ."
Thus, the only basis for Dr. McCloskey's opinion as to causation was Plaintiff's account of the 16 May 2013 injury and his resulting pain. Dr. McCloskey did not express an independent, objective medical opinion that Plaintiff's alleged injury likely caused or contributed to Plaintiff's back condition.[4] Dr. Brown similarly testified he "[could not] give an opinion as to whether the trauma [alleged] in [Plaintiff's] case led to him having surgery. I mean I can't give an opinion because I don't have any records of that. [Plaintiff] did not complain of that to me." The testimony of Dr. McCloskey and Dr. Brown explaining that a new traumatic event "can" exacerbate a patient's pre-existing back condition even if no change is clinically detectable did not "indicate a reasonable scientific probability that [Plaintiff's ] stated cause produced [Plaintiff's ] stated result.... Ultimately, expert opinion testimony based on speculation and conjecture lacks the reliability to qualify as competent evidence on issues of medical causation." Seay v. Wal-Mart Stores, Inc. , 180 N.C. App. 432, 436-37, 637 S.E.2d 299, 302 (2006) (citations and internal quotation marks omitted).
According to Plaintiff, the Commission misapplied the law with respect to "work-related exacerbation of pre-existing medical conditions." Plaintiff observes this Court has held that "[the] aggravation of a pre[-]existing condition which results in loss of wage earning capacity is compensable."See Goforth v. K-Mart Corp. , 167 N.C. App. 618, 622, 605 S.E.2d 709, 712 (2004). However, Plaintiff was required, and failed, to prove any alleged aggravation of his pre-existing back condition was "the direct result of a specific traumatic incident of the work assigned[.]" See N.C.G.S. § 97-2(6).
III. Conclusion
Plaintiff has failed to demonstrate that the Commission's findings of fact were not supported by competent evidence or that the findings of fact did not support the Commission's conclusions of law. Accordingly, we affirm the opinion and award denying Plaintiff's claim for compensation.
AFFIRMED.
Report per Rule 30(e).
Judges ELMORE and MURPHY concur.

Dr. McCloskey made the following notation in Plaintiff's medical chart on 28 July 2010: "I believe [Plaintiff] would be best treated with an interbody fusion at [the] L5 [vertebra] to S1 [vertebra] in an attempt to stabilize that segment of [his] spine."

Plaintiff stated the following in his proposed issues on appeal: "Are Findings of Fact Nos. 13, 14, 15, 16, 17, and 18 based upon any competent evidence of record looking at the complete record and/or do they represent a misconstruction of the entirety of the expert medical evidence ?" (emphasis added).

Branch testified that, after leaving his job at Lowe's, he spoke with Plaintiff once, when Plaintiff "called [him about] one of the projects [Plaintiff] was working on, want[ing] to know if [Branch] was available to do some of the carpentry work, because [Plaintiff] couldn't handle it." Branch declined Plaintiff's offer.

Plaintiff cites an unpublished decision of this Court, Leggett v. AAA Cooper Transp. , 205 N.C. App. 467, 698 S.E.2d 201 (2010), as holding that a treating physician's testimony was sufficient to establish a causal link between a plaintiff's previous workplace injury and a medical condition that emerged several years later even though "the physician could only say that the [plaintiff's] current disability and need for further medical treatment was 'probably ... related' to the [plaintiff's prior] work injury." While unpublished opinions are not controlling precedent, see State v. Leaks , 240 N.C. App. 573, 577, 771 S.E.2d 795, 798 (2015), we note that in Leggett , unlike the present case, the fact that the plaintiff had sustained a compensable workplace injury was not itself in dispute. The Leggett plaintiff sought additional compensation for new medical treatment, and there was a rebuttable presumption that the plaintiff's need for additional treatment was directly related to the original compensable injury, which the employer failed to overcome. In any event, in the present case, there was no expert testimony that Plaintiff's increased back pain was "probably" related to the alleged 16 May 2013 incident.